## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| HUBER RESOURCES CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 1:23-cv-00410-NT |
| | ) | |
| JEFFREY OLSON, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

Before me is the Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction (ECF No. 4). For the reasons stated below, I **DENY** the motion.

## BACKGROUND

The Plaintiff, Huber Resources Corp. ("**Huber**"), is a family-owned forestry services company. Decl. of Christopher A. Washburn ¶ 3 ("**Washburn Decl.**") (ECF No. 4-1). It provides clients with land management, consulting, forest and natural resource valuation, and litigation support, among other services. Washburn Decl. ¶ 3. Huber is a Delaware corporation with its principal place of business in Old Town, Maine. Washburn Decl. ¶ 3.

Huber manages more than a million acres of timberland across Maine. Washburn Decl. ¶ 4. It also manages timberland in other states, such as Massachusetts, New York, Georgia, Oklahoma, Texas, and states in the Great Lakes region. Washburn Decl. ¶ 4. The company provides consulting services around the

world, including across the Americas, Europe, Africa, Australia, and New Zealand. Washburn Decl. ¶ 4.

Forest and natural resource valuation is an involved process. Washburn Decl. ¶ 5. It requires many steps to generate formal quantifications and valuations of timber on particular pieces of land. Washburn Decl. ¶ 5. Valuation services constitute an ultra-niche industry when done for commercial clients who hold hundreds of thousands of acres or more. Washburn Decl. ¶ 5. According to Huber, it is challenging to find people who are qualified to work as appraiser/valuation experts in this field. Washburn Decl. ¶ 5. The job requires extensive training and compliance with state licensure requirements. Washburn Decl. ¶ 5.

In late May to early June of 2022, Christopher A. Washburn, Huber's Director of Finance, learned that the stockholders of Compass Land Consultants, Inc. ("**Compass**") were interested in selling their business. Washburn Decl. ¶¶ 2, 6. Compass was a Michigan company based in northern Wisconsin that, like Huber, provided forestry services to clients. Washburn Decl. ¶¶ 6–7; Asset Purchase Agreement ("**APA**") Preamble (ECF No. 4-2). Washburn believed that Compass's business complimented Huber's and that an acquisition would add significant value to Huber. Washburn Decl. ¶ 8.

Jeffrey Olson was one of Compass's three stockholders. Washburn Decl. ¶ 6. He is an experienced forest and natural resource valuation expert and holds Certified General Appraiser licenses in multiple states. Washburn Decl. ¶ 6. Olson also has extensive experience with litigation support as an expert witness. Washburn Decl.

¶ 6. Olson was responsible for the valuation side of Compass's business. Washburn Decl. ¶ 6.

Following promising initial discussions between Huber's senior leadership and Compass's three stockholders, Huber and Compass signed a non-binding indication of interest. Washburn Decl. ¶ 9. Huber then undertook an extensive due diligence process, which included hiring an auditing firm to conduct a thorough review of Compass's finances. Washburn Decl. ¶ 10. Huber also hired a law firm to do a legal review. Washburn Decl. ¶ 10. Huber itself undertook the project of carefully analyzing the market, Compass's book of business, and Compass's personnel. Washburn Decl. ¶ 10.

The two companies reached a deal, and on April 29, 2023 Huber, Compass, Olson, and the other two Compass stockholders signed an asset purchase agreement. Washburn Decl. ¶ 12. Through the APA, Huber acquired substantially all of Compass's assets in exchange for over a million dollars. Washburn Decl. ¶ 13. These assets included forty-eight existing engagements between Compass and its clients. Washburn Decl. ¶ 13. In addition, the two companies agreed that Compass's employees, including its stockholders, would transition to employment with Huber as part of the deal. Washburn Decl. ¶ 16. The Compass stockholders advocated for their employees during negotiations and Huber saw value in retaining Compass's qualified valuation employees. Washburn Decl. ¶ 16. Huber hired all twenty-one of Compass's employees on April 25, 2023, four days before formally acquiring Compass. Washburn Decl. ¶ 16.

In connection with the sale of their business, Olson and the other Compass stockholders agreed to certain restrictive covenants. Washburn Decl. ¶¶ 15, 17. Two of those covenants are relevant here: (1) the agreement not to compete with Huber; and (2) the promise not to solicit certain Huber employees or customers. Washburn Decl. ¶¶ 15, 17.

The non-competition provision of the APA reads as follows:

(i)    The Seller and the Stockholders hereby acknowledge that (A) the Seller conducts the Business and/or has current plans to expand the Business throughout the Territory and (B) to protect adequately the interest of the Purchaser in the business and goodwill of the Seller, it is essential that any non-competition covenant with respect thereto cover all of the Business and the entire Territory.

(ii)    Neither the Seller nor any Stockholder will, during the Non-Compete Period, in any manner, either directly, indirectly, individually, in partnership, jointly or in conjunction with any Person other than the Purchaser, (A) engage in the Business within the Territory, or (B) have an equity or profit interest in, advise or render services (of an executive, marketing, manufacturing, research and development, administrative, financial, consulting or other nature) or lend money to any Person that engages in the Business within the Territory.

APA § 7.4(b). Compass is the "Seller," Huber is the "Purchaser," and Olson is one of the "Stockholders." APA Preamble, Signature Page. The "Business" is "the business of the Seller, which such business consists of providing forest and natural resource valuation, acquisition due diligence, forest inventory, forest modeling, investment analysis, economic studies, GIS consulting and land management services to private and public clients." APA § 1.1. The "Territory" is "the United States of America, Canada, South America, Central America, Australia, New Zealand, Europe and

Africa." APA § 1.1. The "Non-Compete Period" is "the period ending on the fifth

anniversary of the Closing Date." APA § 1.1.

The employee and customer non-solicitation provision of the APA reads as

follows:

> Neither the Seller nor any Stockholder will, during the Non-Compete
> Period, in any manner, directly, indirectly, individually, in partnership,
> jointly or in conjunction with any Person: (i) (A) recruit or solicit or
> attempt to recruit or solicit, on any of their behalves or on behalf of any
> other Person, any Transferred Employee, (B) encourage any Person
> (other than the Purchaser or one of its Affiliates) to recruit or solicit any
> Transferred Employee, or (C) otherwise encourage any Transferred
> Employee to discontinue his or her employment by the Purchaser or one
> of its Affiliates; (ii) solicit any customer of the Purchaser or an Affiliate
> thereof who is or has been a customer of the Seller on or prior to the
> Closing Date for the purpose of providing, distributing or selling
> products or services similar to those sold or provided by the Purchaser;
> or (iii) persuade or attempt to persuade any customer or supplier of the
> Purchaser (or any of its Affiliates) to terminate or modify such
> customer's or supplier's relationship with the Purchaser (or any of its
> Affiliates).

APA § 7.4(c). "Transferred Employee" means the Compass employees who became

Huber employees as part of the deal.[1] APA § 1.1.

Following the sale, Olson managed the Wisconsin-based appraisal team that

transitioned from Compass to Huber. Washburn Decl. ¶ 19. With Huber, Olson

---

[1]      "Affiliate" means "with respect to any Person, any other Person, directly or indirectly, controlling, controlled by or under common control with such Person." Asset Purchase Agreement ("**APA**") § 1.1 (ECF No. 4-2). "Person" means "any individual, Entity, Governmental Body or other organization." APA § 1.1. "Entity" means "any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity." APA § 1.1. "Governmental Body" means "any (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature, (b) federal, state, local, municipal, foreign, supranational or other government or (c) governmental, self-regulatory or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or Entity and any court or other tribunal)." APA § 1.1.

continued the work he had previously done for Compass, namely, forest and natural resource management, as well as expert witness consulting. Washburn Decl. ¶ 19.

Olson's employment with Huber, however, did not last long. He started looking for another job as early as July of 2023, less than three months after signing the APA. Second Decl. of Nolan L. Reichl ("**Second Reichl Decl.**") ¶ 4, Exs. C & D (ECF Nos. 60-1, 60-4, 60-5). In early August of 2023, Olson told members of Huber's senior management that Huber may not be a fit for him and that he might start looking for a job elsewhere. Washburn Decl. ¶ 20. On August 23, 2023, just under four months after Huber acquired Compass, Olson submitted his resignation and gave Huber his two weeks' notice. Washburn Decl. ¶ 21.

Olson promptly began working as a "Senior Appraiser" for LandVest, which Huber views as a competitor. Washburn Decl. ¶ 23; Decl. of Jeff Olson ("**Olson Decl.**") ¶¶ 15–16 (ECF No. 20-1). According to Huber, Olson offered the same services at LandVest that he had offered at Compass and Huber. Washburn Decl. ¶ 23. And, Olson performed work for LandVest on at least one specific contractual engagement Huber acquired from Compass through the APA. Washburn Decl. ¶ 30. For example, Olson emailed Huber from his LandVest account to request client files he had worked on at Huber so he could prepare expert testimony for upcoming trials. Washburn Decl. ¶ 30; Washburn Decl. Ex. J (ECF No. 4-11). When Washburn communicated with one of these clients about its decision to leave Huber for LandVest, the client explained that it wanted to continue to work with Olson. Washburn Decl. ¶ 32. Specifically, the client noted the "severe lack of qualified appraisers" fit to meet its

needs and its view that Huber no longer employed anyone qualified. Washburn Decl.
¶ 32; Washburn Decl. Ex. M (ECF No. 4-14).

On September 15, 2023, just over a week after Olson's last day with Huber,
two employees on his Huber team submitted their notices of resignation and accepted
positions with LandVest. Washburn Decl. ¶¶ 22, 24–26. During their exit interviews,
both employees told Huber that they would be working with Olson at LandVest.
Washburn Decl. ¶¶ 25–26.

On October 30, 2023, Huber filed a complaint against Olson for breach of
contract alleging that he violated the APA's non-competition provision (Count I);
client non-solicitation provision (Count II); and employee non-solicitation provision
(Count III). Compl. ¶¶ 21–41 (ECF No. 1). That same day, Huber filed a motion for a
temporary restraining order and/or preliminary injunction with respect to the non-
competition and employee non-solicitation counts. Mot. for TRO and/or Prelim. Inj.
(“**Huber's Mot.**”) (ECF No. 4). I held phone conferences with counsel on October 31,
November 2, and November 3, 2023 to discuss the motion.

Through these discussions, the parties agreed to a briefing schedule and
“standstill” arrangement. Specifically, they agreed that Olson would stop all work for
LandVest, except for work necessary to meet his scheduled trial and testimony-
related commitments for three discrete matters, until I issued my order on the
motion. Procedural Order (ECF No. 15). The parties completed their briefing and

submitted supporting declarations and other record materials. Huber requested non-testimonial oral argument, which I held on December 20, 2023 (ECF No. 33).[2]

At the end of oral argument, I shared with the parties that I thought they had close case. I asked if they would be interested in trying to settle the matter before I issued my order, given the risks on both sides. The parties reported back that they were interested in scheduling the matter for a judicial settlement conference. On February 15, 2024, Magistrate Judge Nivison held a settlement conference, after which he reported that settlement talks would continue (ECF No. 41). The parties continued to negotiate through Judge Nivison for over two months, but determined by April 29, 2024 that they would not be able to reach a negotiated resolution. Joint Mot. for Entry of Revised Scheduling Order ("**Joint Mot.**") 1 (ECF No. 50). Judge Nivison approved a revised scheduling order, which permitted Olson to submit a revised declaration and the parties to submit supplemental briefing on Huber's pending motion for a preliminary injunction. Joint Mot. 2; Order on Mot. to Amend Scheduling Order (ECF No. 51). The parties have now filed these updated and supplemental materials (ECF Nos. 55, 60, 63).[3]

---

[2]     Given this history, and in light of my discussion with counsel during oral argument, I treat this as a motion for a preliminary injunction and not a temporary restraining order.

[3]     Huber requested oral argument on these supplemental materials. Pl.'s Req. for Oral Arg. on Mot. for TRO and/or Prelim. Inj. (ECF No. 62). Olson took no position on this request. Def. Jeffrey Olson's Resp. to Pl.'s Req. for Oral Arg. on Its Mot. for TRO & Prelim. Inj. (ECF No. 71). Based on my review of the parties' filings, and given that I have already held oral argument on this motion, I do not view a second oral argument as helpful here. I therefore **DENY** Huber's request for a second oral argument.

In the meantime, Huber has amended its complaint twice and the parties have amended their standstill agreement several times (ECF Nos. 37, 40, 49, 57, 59, 74, 76). The operative complaint adds two counts: fraud pleaded in the alternative (Count IV) and breach of contract for violation of confidentiality obligations (Count V). Second Am. Compl. ¶¶ 42–59 (ECF No. 57).

## LEGAL STANDARD

A district court must consider four factors in determining whether to grant a preliminary injunction: (i) "the movant's likelihood of success on the merits of its claims"; (ii) "whether and to what extent the movant will suffer irreparable harm" in the absence of injunctive relief; (iii) "the balance of hardships as between the parties"; and (iv) the impact, if any, that granting or denying the injunction would have on the public interest. *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). District courts have "broad discretion" on whether to grant preliminary injunctive relief. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16, 20 (1st Cir. 1996).

## DISCUSSION

## I.   Likelihood of Success on the Merits

The likelihood of success on the merits "is the main bearing wall" of the preliminary injunction test. *Id.* at 16. Without it, "the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287

F.3d 1, 9 (1st Cir. 2002). This factor does not require that I predict the outcome "with absolute assurance." *Ross-Simons*, 102 F.3d at 16. Instead, my "conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of probable outcomes." *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991).

### A.    Olson's Covenant Not to Compete

To establish likelihood of success on the merits, Huber must show that Olson "has more likely than not breached an enforceable restrictive covenant." *Kodiak Bldg. Partners, LLC v. Adams*, No. 2022-0311-MTZ, 2022 WL 5240507, at *4 (Del. Ch. Oct. 6, 2022). Olson asserts that the APA's non-competition term is unenforceable, and in any event, he did not breach it. Def. Jeffrey Olson's Opp'n to Pl. Huber Res. Corp.'s Mot. for TRO & Prelim. Inj. ("**Olson's Opp'n**") 3–10 (ECF No. 20); Def. Jeffrey Olson's Resp. to Pl.'s Suppl. Mem. in Supp. of Mot. for TRO & Prelim. Inj. ("**Olson's Suppl. Mem.**") 2–3 (ECF No. 63). Huber takes the opposite view. Huber's Mot. 10–13; Pl.'s Reply in Supp. of Mot. for TRO & Prelim. Inj. ("**Huber's Reply**") 2–4 (ECF No. 24); Pl.'s Suppl. Mem. in Supp. of Mot. for a TRO & Prelim. Inj. ("**Huber's Suppl. Mem.**") 5 n.2 (ECF No. 60). The parties agree that Delaware law applies. Huber's Mot. 9; Olson's Opp'n 1.

"Under Delaware law, a covenant not to compete must: (1) be reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities in order to be enforceable." *Lyons Ins. Agency, Inc. v. Wilson*, No. 2017-0092-SG, 2018 WL 4677606, at *5 (Del. Ch. Sept. 28, 2018). "Generally, covenants not to compete in

the context of a business sale are subject to a 'less searching' inquiry than if the covenant 'had been contained in an employment contract.' " *Kodiak*, 2022 WL 5240507, at *4 (quoting *Tristate Courier & Carriage, Inc. v. Berryman*, No. 20574-NC, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004)).

I begin with whether Olson's non-compete is likely reasonable in scope. In the context of a business sale, the reasonableness of a restrictive covenant's geographic scope cannot be determined by simply looking at the physical distance it describes, rather it must be evaluated "by reference to the area in which a covenantee has an interest the covenants are designed to protect." *Id.* at *11 (quoting *Weichert Co. of Pa. v. Young*, No. 2223-VCL, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007)). "Restrictive covenants in connection with the sale of a business legitimately protect only the purchased asset's goodwill and competitive space that its employees developed or maintained." *Id.* at *10. So, "such covenants must be tailored to the competitive space reached by the seller and serve the buyer's legitimate economic interests." *Intertek Testing Servs. NA, Inc. v. Eastman*, No. 2022-0853-LWW, 2023 Del. Ch. LEXIS 66, at *7 (Del. Ch. Mar. 16, 2023); *see, e.g., O'Leary v. Telecom Res. Serv., LLC*, No. 10C-03-108-JOH, 2011 WL 379300, at *5 (Del. Super. Ct. Jan. 14, 2011) (upholding four-year, nationwide non-compete where seller's business operated nationwide).

Accordingly, I must assess the competitive space reached by Compass, the selling business. In the APA, Compass represented that it "conducts the Business and/or has current plans to expand the Business throughout the Territory." APA § 7.4(b)(i). As noted above, the APA defines "Territory" as "the United States of

America, Canada, South America, Central America, Australia, New Zealand, Europe and Africa." APA § 1.1. However, in this litigation, Olson maintains that Compass's market was limited to Canada and the United States. Specifically, he claims that Compass managed forestland in Wisconsin, Michigan, Minnesota, and Ontario, and provided appraisal services in "select Canadian Provinces of Ontario"[4] and "Mid-West and Lake Region states, such as Wisconsin, Minnesota, Michigan, South Dakota, and North Dakota." Olson Decl. ¶ 2. Olson further asserts that "Compass had no market, and did not provide services, in Europe, Africa, South America, Central America, Australia, or New Zealand, or any other country."[5] Olson Decl. ¶ 2.

The non-compete section of the APA does not distinguish between where Compass actually operated at the time of sale, versus where Compass "ha[d] current plans to expand." APA § 7.4(b)(i). Olson has provided uncontroverted evidence that Compass actually operated in parts of the United States and Canada. Olson Decl. ¶ 2. On this record, the best I can tell is that Compass did not actually operate in the vast majority of the non-compete's geographic scope at the time of sale (Europe, Africa, South America, Central America, Australia, New Zealand, parts of the United States, and parts of Canada).

---

[4]     Ontario *is* a province of Canada, so it is not clear what geographic area this part of Olson's declaration is meant to describe.

[5]     The operative Complaint also makes assertions concerning Compass's market (and planned future market) as of the date of sale, Second Am. Compl. ¶ 9 (ECF No. 57), but unverified allegations in a pleading are insufficient to support a preliminary injunction. *See* § 2949 Procedure on an Application for a Preliminary Injunction, 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure. § 2949 (3d ed. 2023). And, in any event, the assertion is disputed. *See* Def. Jeffrey Olson's Answer to Pl.'s Second Am. Compl. ¶ 9 (ECF No. 61).

This raises the question of whether the geographic scope of a non-compete can be reasonable if it covers areas in which the selling business does not currently operate, but plans to operate sometime in the future. At least one Delaware court has accepted this type of geographic scope as reasonable, but only where the purchased business did actually expand to almost all of the forecasted areas during the non-compete's enforcement period. *See Kan-Di-Ki, LLC v. Suer*, No. 7937-VCP, 2015 WL 4503210, at *20 & n.236 (Del. Ch. July 22, 2015). The court explained that the geographic reasonableness of the non-compete "might have presented a closer question" if the business had not expanded more or less according to plan. *Id.* Under that scenario, it would be harder to conclude that the non-compete was reasonably calibrated to protect what the buyer had purchased. *Id.* at *20 & n.236.

At this stage of the matter, I cannot say that Huber has carried its burden in establishing that the geographic scope of the non-compete is likely reasonable. At best, the evidence before me shows that at the time of sale, Compass had plans to expand to many continents beyond its actual area of operation. But the assertion to that effect in the APA, by itself, is not enough to carry the day.[6] *Cf. O'Leary*, 2011 WL

---

[6]     Huber maintains that Olson's description in this litigation of the limited geographic scope of Compass's business constitutes an admission that he misrepresented Compass's business to Huber in connection with the APA. Pl.'s Reply in Supp. of Mot. for TRO and Prelim. Inj. ("**Huber's Reply**") 2 (ECF No. 24). I am not so sure, given that the language in the APA does not distinguish between where Compass operated and where it planned to operate in the future. *See* APA § 7.4(b)(i). I also question, given the extensive diligence process Huber describes, how Huber could have been in the dark about where Compass did business (or had active plans to do business in the future) when it agreed to buy the company. *See* Decl. of Christopher A. Washburn ¶ 10 (ECF No. 4-1).

     I do, however, note that Huber has now amended its Complaint to add a claim for fraud pleaded in the alternative (Count IV). Second Am. Compl. ¶¶ 42–52. This claim addresses whether Olson made misrepresentations to Huber about the geographic scope of Compass's business, and whether those misrepresentations amount to fraud. Second Am. Compl. ¶¶ 42–52. I will have occasion to evaluate this claim as litigation proceeds, but it is not the basis for Huber's current motion for a preliminary injunction.

379300, at *5 (holding four-year, nationwide non-compete in connection with the sale of a business reasonable in light of assertions in a purchase agreement *and* evidence that the selling business actually "operated nationwide before the sale").

But that is just part of the scope. "When evaluating the reasonableness of a restrictive covenant, a court must consider how the temporal and geographic restrictions operate together. The two dimensions necessarily interact." *Kan-Di-Ki*, 2015 WL 4503210, at *19 n.231 (quoting *Del. Elevator, Inc. v. Williams*, No. 5596-VCL, 2011 WL 1005181, at *8 (Del. Ch. Mar. 16, 2011)). Sensibly, a short term may save what would otherwise be a geographically overbroad non-compete, and vice versa. But the term here—five years from the date of sale—is not short. And while Huber is correct that Delaware courts have enforced five-year non-competes in ultra-niche industries in connection with the sales of businesses, Huber has not pointed to any cases where a non-compete of this length was deemed reasonable when paired with a multi-continent geographic scope. Huber's Mot. 11–12 (citing *Kan-Di-Ki*, 2015 WL 4503210, at *19 (finding a five-year, 23-state non-compete executed in connection with the sale of a business reasonable in scope)). Thus, on this record, the non-compete is not likely reasonable in its geographic scope and temporal duration.

Because the non-compete is likely unreasonable in its geographic scope and temporal duration, Huber cannot show a likelihood of success on the merits.[7] *See*

---

[7]    Because I have found that the non-competition provision is likely unenforceable, I do not reach Olson's additional arguments that his work for LandVest does not actually violate the APA or that Huber has selectively enforced the non-compete requirement. Def. Jeffrey Olson's Opp'n to Pl. Huber Res. Corp.'s Mot. for TRO & Prelim. Inj. 7–9 (ECF No. 20).

*Lyons*, 2018 WL 4677606, at *5 (a covenant not to compete "must" meet all three requirements).

### B.    Olson's Covenant not to Solicit Employees or Customers

As with non-compete covenants, non-solicitation covenants are enforceable under Delaware law if they meet general contract law requirements and (1) are reasonable in scope and duration; (2) advance legitimate economic interests; and (3) survive a balancing of the equities. *FP UC Holdings, LLC v. Hamilton*, No. 2019-1029-JRS, 2020 WL 1492783, at *13 (Del. Ch. Mar. 27, 2020). Olson maintains that the non-solicitation restrictive covenants are unenforceable, while Huber, of course, takes the opposite view.[8] Olson's Opp'n 12; Huber's Mot. 13–14; Huber's Suppl. Mem. 11–13; Olson's Suppl. Mem. 6–7.

For the question of enforceability, I begin with whether the non-solicitation restrictions are reasonable in scope and duration. In essence, Olson's employee non-solicitation covenant prevents him from recruiting any of the Compass employees who became Huber employees to work anywhere other than Huber for a period of five years. APA 7.4(c)(i). And, his customer non-solicitation covenant generally prevents him from encouraging any Compass customers who became Huber customers from taking their business elsewhere, or more generally from encouraging any Huber customer to leave Huber, for that same five-year period. APA 7.4(c)(ii), (iii).

---

[8]    Originally, Huber only sought a preliminary injunction with respect to the employee non-solicitation covenant, not the customer non-solicitation covenant. Huber's Reply 1 n.1. However, in light of information since learned in discovery, Huber is now also seeking a preliminary injunction with respect to the customer non-solicitation covenant. Huber's Suppl. Mem. in Supp. of Mot. for TRO & Prelim. Inj. 10 (ECF No. 60).

In one sense, the scope of these covenants seems reasonable: they are limited to the employees who transferred from Compass to Huber in the sale and to Huber's customers. Moreover, they only ban solicitation activities, they do not purport to stop any employee or customer from leaving Huber for another company. But the length—five years—is significant. Huber has not cited, and on a cursory search I have not found, an example of a Delaware court enforcing a five-year non-solicitation agreement where the issue of enforceability was in dispute.[9] Huber carries the burden on this motion, and at present, I cannot say it is likely to succeed in establishing that the non-solicitation provisions are reasonable. At a later stage, Huber is of course free to make further argument that the five-year non-solicitation provisions are reasonable under Delaware law.

Because Huber has not demonstrated that the non-solicitation covenants are likely reasonable in duration, they are therefore not likely enforceable. And, because they are not likely enforceable, I need not determine whether Olson likely breached them for purposes of resolving this preliminary injunction motion.[10]

---

[9]    In its original motion, Huber did cite a case that involved a five-year non-solicitation restrictive covenant, albeit in the section of its brief that discussed irreparable harm. Mot. for TRO and/or Prelim. Inj. 15, 17 (ECF No. 4) (citing *Gener8, LLC v. Castanon*, No. 2022-0426-LWW, 2023 WL 6381635 (Del Ch. Sept. 29, 2023)). There, however, the business-seller did "not challenge the enforceability of the restrictive covenant or the reasonableness of its scope," so the court had no occasion to weigh that question. *Gener8*, 2023 WL 6381635, at *19.

[10]   At this preliminary stage, Huber has presented compelling evidence that Olson did in fact solicit employees and customers in violation of the APA. For example, in August of 2023, while still employed by Huber, Olson sent a colleague at Huber a LandVest job posting and encouraged her to apply. He wrote: "[w]e want to bring over most of our team, and LandVest will take whomever we feel would benefit them." Suppl. Decl. of Jeffrey Olson ("**Olson Suppl. Decl.**") ¶ 5 (ECF No. 55). In addition, the same day Olson gave Huber his two weeks' notice, he emailed a contact at LandVest asking for a work email account as soon as possible because, in his words, he was "working on procuring several large contracts for future work" and had told these clients that he was "on the move" and would prefer to secure the contracts in a few weeks, presumably, once he was employed by

## II.    **Blue Penciling**

Huber points out that if I ultimately find that Olson's restrictive covenants are overbroad in scope, I have the authority to re-write them to limit their reach. Huber's Mot. 12 n.4; Huber's Reply 3; Huber's Suppl. Mem. 5–8. This practice is known as "blue penciling."

On the one hand, some Delaware courts are reticent to exercise discretion in equity to allow parties to draft overbroad non-competes, and then seek the court's help to walk them back to reasonableness if challenged. *See, e.g., Intertek*, 2023 Del Ch. LEXIS 66, at *9–10; *FP UC Holdings*, 2020 WL 1492783, at *8; *Del. Elevator,* 2011 WL 1005181, at *10–11. Blue penciling overbroad restrictive covenants "puts the employer in a no-lose position." *Del. Elevator*, 2011 WL 1005181, at *10. "If an employer knows that the court will enforce a reasonable covenant as a fallback, the employer has every reason to start with an overbroad provision." *Id.* And overbroad non-competes then give employers unfair advantages, for example by discouraging employees from leaving or causing those who do leave to sit out of the competitive marketplace to avoid litigation.[11] *Id.*

---

LandVest, and not Huber. Olson Suppl. Decl. ¶ 12. While those violations may ultimately matter only if the APA is enforceable, I am struck by the lack of regard Olson displayed for the promises he made when he sold his share of Compass. As discussed in Section II, this type of evidence may well factor into my decision whether to blue pencil the APA.

[11]    These considerations may, of course, be somewhat different in the context of a sale of a business, for example if the parties had closer to equal bargaining power when they reached the deal. In a recent decision, a Delaware court went so far as to suggest that an action "may well present the opposite side of the blue penciling coin" where a business seller with superior bargaining power potentially "negotiate[d] overbroad restrictions, banking on this Court striking the restrictions entirely." *Labyrinth, Inc. v. Urich*, No. 2023-0327-MTZ, 2024 WL 295996, at *24 (Del. Ch. Jan. 26, 2024).

On the other hand, blue penciling is an equitable power, meaning courts have discretion to fashion remedies tailored to the case before them. Here, Huber has presented evidence that Olson made false and misleading statements in a declaration filed with this Court about his communications with former Compass employees, violated this Court's standstill agreement, and showed little regard for the adverse financial consequences his actions would have on his former Compass partners. Huber's Suppl. Mem. 2–5, 6–8, 8 n.6; Olson Decl. ¶ 31; Suppl. Decl. of Jeffrey Olson ¶¶ 8–10 (ECF No. 55); Suppl. Decl. of Jeffrey Olson Ex. E (ECF No. 55-5); Second Reichl Decl. ¶¶ 4, 6, Exs. D & F (ECF No. 60-7). On a full record and in context, Olson's conduct "may conceivably present a rare instance where equity and public policy might require blue penciling." *Labyrinth, Inc. v. Urich*, No. 2023-0327-MTZ, 2024 WL 295996, at *25 (Del. Ch. Jan. 26, 2024).

But I will not resolve this question now. Rather, I will decide whether to blue pencil Olson's restrictive covenants at the end of the case, with the benefit of a complete record. *See Labyrinth*, 2024 WL 295996, at *25 (internal quotations omitted) ("I cannot resolve this [blue penciling] uncertainty without the confidence of findings made after a trial or on undisputed facts." (internal quotation marks omitted)); *C & J Energy Servs., Inc. v. City of Miami Gen. Emps.*, 107 A.3d 1049, 1054 (Del. 2014) ("To blue-pencil a contract as the Court of Chancery did here is not an appropriate exercise of equitable authority in a preliminary injunction order.").

## CONCLUSION

For the reasons stated above, I **DENY** Huber's motion for a temporary restraining order and/or preliminary injunction (ECF No. 4).

SO ORDERED.

/s/ Nancy Torresen

United States District Judge

Dated this 19th day of July, 2024.